United States District Court
Southern District of Texas
**ENTERED**
January 23, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BridgeTower Opco LLC, d/b/a Best Companies Group, § § § § *Plaintiff,* § § v. § § Workforce Research Group LLC § and Peter Burke, § § *Defendants.* | Case No. 4:21-cv-02999 |

# ORDER GRANTING IN PART
# MOTION FOR SPOLIATION SANCTIONS

On December 9, 2022, the Court convened an evidentiary hearing to resolve a motion filed by BridgeTower Opco, LLC d/b/a Best Companies Group ("BridgeTower") seeking sanctions for spoliation of evidence, which was referred to the undersigned judge. *See* Dkt. 61 (granting request for hearing); Dkt. 46 (motion); Dkt. 54 (response); Dkt. 58 (reply); Dkt. 63 (Defendants' supplemental brief). As detailed below, the Court concludes that the deletion of emails by Defendant Peter Burke warrants imposing sanctions that will compensate BridgeTower for certain expert fees and attorneys' fees. BridgeTower's request for further sanctions is denied.

I. **Findings of Fact**

    A. **Burke's departure from Bridgetower**

1. Defendant Peter Burke ("Burke") was the co-founder and President of Best Companies Group ("BCG"). Dkt. 54, Ex. 1 ¶ 2.

2. In 2019, after a series of acquisitions and mergers, BCG became a division of Gannett Co., Inc. and was operated by Gannett's subsidiary. *Id.* ¶¶ 3-4. In 2020, that subsidiary was sold to Plaintiff BridgeTower, *id.* ¶ 7, which operates under the BCG name.

3. On July 12, 2021, Burke gave notice of his resignation from BCG. Tr.34.

4. On his last day—July 16, 2021—Burke deleted all his work emails from his BCG laptop. Tr.31, 34. According to his testimony, Burke assumed that BridgeTower's IT system had a back-up of his emails. Tr.31-32, 99.

5. Burke testified that deleted his work emails to ensure that it was clean and ready for someone else to use it. Tr.31-32, 98. This benevolent justification was not credible, particularly given Burke's contemporaneous downloading of BCG information onto a personal hard drive, Tr.33, and his pursuit of a new business that would compete with BCG, *see, e.g.*, PX14 (Burke's July 7, 2021 email to then-BCG employee, Susan Springer, discussing potential clients for new company).

6. At the hearing, however, BridgeTower disclaimed any theory that

Burke had a duty to preserve those emails when he deleted them in July 2021. Tr.10.

7. Burke hired several of his former BCG employees to join him at his new company, Workforce Research Group ("WRG"). Tr.34. Those employees were Susan Springer, Megan Burns, and Katie Nageotte. Tr.34-35; Dkt. 66-1, Ex. A at 6.[1] Burke had communicated with these three individuals through his personal email account before leaving BCG. Tr.35, 37-40; PX14 (July 7, 2021 email chain, Burke and Springer).

**B. Events leading up to the temporary restraining order**

8. On August 24, 2021, Bridgetower's counsel sent Burke a cease-and-desist letter. PX2; Tr.74-75. Among other things, the letter formally advised Burke of his legal duty to preserve all information—including text messages and emails—"relevant to the facts surrounding BridgeTower's potential claims." PX2 at 2.

9. On September 23, 2021, after BridgeTower filed this suit, the Court entered a temporary restraining order ("TRO"). Dkt. 8; PX1. The TRO prohibited the parties "from modifying, altering or destroying any evidence related to the allegations in this lawsuit, including but not limited to any

---

[1] Dkt. 66-1 includes deposition excerpts from multiple witnesses. The pinpoint citations used herein refer to the page number of the pdf, on the Court's header, rather than the court reporter's page numbering for each deposition.

3

emails, text messages, or electronic data related to Burke or Burns' employment or the alleged misappropriation of [BridgeTower's] confidential information and trade secrets." Dkt. 8 ¶ 4. This prohibition extended both to Burke and to his company, WRG. *Id.*; Tr.75.

### C. Burke's subsequent deletion of emails

10. Burke used a software application called Mozilla Thunderbird to access his Comcast personal email account from his laptop. Tr.50, 79.

11. For a few weeks after leaving BCG, Burke used the Comcast account as his work account. Tr.30-31, 42, 59.

12. On October 5, 2021, Burke provided his laptop to a vendor, Ricoh, for forensic imaging. DX4; Tr.81-82.

13. Forensic imaging preserves everything on the device at the time the image was made and makes the information accessible for later review. *See* Dkt. 66-1, Ex. D at 51 (Taub). As the parties' agreed ESI protocol states, "[f]orensic imaging of computer storage devices/data sources is specifically designed to protect the integrity of the digital evidence and to allow recovery of all data that can potentially include 'hidden,' erased, ... or encrypted files. Forensic imaging is the preferred method of data preservation .... A forensic image preserves the evidence and maintains the complete original storage media in its entirety." DX6 at 1 ¶ 3; Tr.111-12; *see also* Tr.117 (testimony of digital forensics expert, Noel Edwin Kersh).

14. Within a day after his laptop was forensically imaged, Burke deleted several hundred emails from his personal Comcast email account. Tr.30-31, 89.

15. Burke gave conflicting explanations as to why he believed that deleting those emails was appropriate. During his deposition, Burke testified that someone from Ricoh advised him to delete the information. No one from Ricoh corroborated Burke's assertion. *See* Dkt. 66-1, Ex. D at 47-48 (Taub had no knowledge of anyone telling Burke to delete emails).

16. At the evidentiary hearing, Burke put a different gloss on the deletions. In conjunction with the imaging of Burke's laptop on October 5, 2021, Ricoh had recommended systematically removing potentially relevant documents from his laptop through an agreed remediation process. DX4 at 7; Tr.82. This process was designed to satisfy BridgeTower's concerns about Defendants' use or access to BCG proprietary or confidential information. *See* Dkt. 8 ¶¶ 1-2 (prohibiting Defendants from using BCG's confidential or trade secret information).

17. According to Burke, it then occurred to him that similarly objectionable materials might be contained in his Comcast account. Tr.29-30, 89. This allegedly prompted Burke to conduct his own unilateral process of "removing" emails from his Comcast account, ostensibly to ensure his compliance with the TRO. Tr.26-28, 89.

5

18. Burke never consulted with Ricoh, BridgeTower, or anyone else before deleting those emails. Tr.103-04, 110. Burke should have known that his unilateral clean-up operation was improper, especially when contrasted with the carefully monitored and documented process Ricoh employed when remediating Burke's laptop. Burke's shifting justifications for deleting the emails further undermines his assertions that the deletions were made in a good faith attempt to comply with the TRO.

19. Burke assumed that Ricoh already had a copy of those Comcast emails because his laptop had been imaged anyway. Tr.28, 90. BridgeTower's digital forensics expert, Noel Kersh, testified that a forensic image of a computer does not necessarily capture everything in an email account as of the date of the image. Tr.118-19. That depends on how recently the computer has accessed and pulled information from the web email server. Tr.119, 121.

20. The October 5, 2021 forensic image of Burke's laptop indicates that the laptop (via the Thunderbird software application) last connected with his Comcast web account at 1:00 p.m. on October 1, 2021. Tr.119 (Kersh's testimony). Thus, the forensic image would not reflect any changes to the Comcast email account between those days. *Id.*; Tr.121.

21. But BridgeTower proffered no evidence suggesting that any emails were modified or lost during the few days (after 1:00 p.m. on October 1 until the imaging on October 5) that Burke's laptop had not connected with the

6

Comcast web/cloud server.

22. Moreover, the forensic image did preserve other relevant emails, including: (a) a June 21, 2021 email chain with an attached slide deck entitled "Best Companies Group Rebranding Project," PX4; Tr.51-52; (b) June 25, 2021 email forwarding BCG files to Burke's Comcast account, PX5, and then sending those same files to someone Burke was considering as a vendor for his new company, PX6, Tr.56-57; (c) a July 25, 2021 email reflecting Burke's solicitation of business from the Kentucky Chamber of Commerce (after Burke's departure from BCG), PX7; Tr.58-59; and (d) emails on July 8 and 9, 2021 discussing Megan Burns's non-compete agreement, PX8; PX9; PX10; Tr.60. *See* Tr.62-63.

23. BridgeTower identified only a handful of emails that were not recovered from the forensic image of Burke's laptop, but instead were obtained through discovery from other sources:

- an email on July 2, 2021 scheduling a Zoom call with Burke, Nageotte, Burns, and Springer to discuss the new company, WRG, PX19; Tr.70;

- an email on July 6, 2021 from Springer to Burke with DE&I survey questions. PX18; Tr.69;

- an email on July 7, 2021 from Burke's Comcast account to Susan Springer, while both persons were still working for BCG,

7

cautioning her "to be careful not to take stuff from the G drive. They can see what gets copied to external drives. That could be considered proprietary info." PX14; Tr.38-39;

- an email on July 28, 2021 from Springer to Burke forwarding information from BCG. PX17; Tr.66-68.

24. Given Burke's habit of cleaning out his inbox and retaining only a few that he wished to keep, *see, e.g.*, Tr.40, 42, 52, it is likely that those July 2021 emails were deleted sometime before his receipt of the August 24, 2021 cease-and-desist letter, and thus before BridgeTower maintains that Burke had a duty to preserve documents related to this suit.

25. The fact that those July 2021 emails were not found in the forensic image does not suggest that Burke's email deletions after October 5, 2021 impaired BridgeTower's ability to prove its claims. Nor is there any indication that those emails were improperly deleted after the September 23, 2021 TRO.

26. Burke's improper deletion of emails did cause BridgeTower to incur expert costs investigating the deletion of his Comcast emails and locating them on the forensic image. *See* Tr.123 (estimating between $5,000 to $10,000 in expert fees). Indeed, it was BridgeTower's expert that found the backup of Burke's Comcast account under his Thunderbird profile on the forensic image and provided that information to Ricoh. PX3 (Ricoh's project notes stating that "opposing's Forensic company (Pathway) found a Mozilla Thunderbird profile

8

for the Comcast account, which [Ricoh] didn't find. Opposing counsel now provided those emails as items 02 to 04, based on client's search criteria provided to Pathway"); Tr.122, 135. Burke did not tell Ricoh that he had deleted those emails until after Ricoh began gathering production in January, 2022. *See* DX7 (Jan. 28, 2022 email chain with Ricoh's collection of emails; Burke does not mention his prior deletions).

### D. Deleted text messages

27. Burke admitted that it was his routine practice to delete text messages upon receiving them. Tr.72-73. This practice continued even after this suit was filed, until BridgeTower raised it as an issue at Burke's deposition. Tr.96-98. After that date, Burke retained his text messages and produced several to BridgeTower. Tr.12, 18, 97.

28. The uncontroverted evidence reflects that it was not Burke's normal practice to conduct business by text message, even with Springer, Nageotte, and Burns. Tr.74, 97. Rather, his text messages were personal in nature. Dkt. 46-1 at 85 (Burke Dep.). BridgeTower offered no evidence contradicting Burke's assertions that the text messages he deleted were irrelevant to this suit. Tr.96-97.

29. In addition, most of Burke's employees corroborated Burke's testimony that he orally instructed them to refrain from deleting text messages in late August or early September 2021. *See* Tr.82-93 (Burke); Dkt. 66-1, Ex.

9

B at 22-23 (Springer); Dkt. 66, Ex. C at 32 (Burns). *But see* Dkt. 66-1, Ex. A at 8-9, 11 (Nageotte testifying that she was not told to stop deleting text messages, and that she deleted texts after this suit was filed).

30. BridgeTower did not meet its burden to show that any lost text messages were related to the allegations in this suit, such that their deletion violated the TRO. *See* Dkt. 8 ¶ 4.

31. BridgeTower also failed to show that the loss of any text messages of unspecified relevance prejudiced its ability to prove its claims.

## II. <u>Conclusions of Law</u>

### A. Legal standards: sanctions for spoliation

1. BridgeTower's combined motion for contempt for violations of the TRO and request for spoliation sanctions raise the same core question: whether Defendants destroyed emails or text messages that they had a duty to preserve. The Court therefore applies the spoliation framework to its analysis.

2. "Spoliation is the destruction or the significant and meaningful alteration of evidence." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010).

3. "A spoliation claim has three elements: (1) the spoliating party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the moving party must show that the spoliating party acted

in bad faith." *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 574 (5th Cir. 2020). "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015).

4. To justify the severest sanctions, however, the injured party must further demonstrate that the lost evidence was relevant, such that its loss prejudiced the party's ability to prove its claims or defenses. *See Quantlab Techs. Ltd. (BG) v. Godlevsky*, 2014 WL 651944, at *10 (S.D. Tex. Feb. 19, 2014) (discussing *Moore v. CITGO Ref. & Chems. Co.*, 735 F.3d 309, 316 (5th Cir. 2013), and *Rimkus*, 688 F. Supp. 2d at 618).

5. The burden of showing prejudice cannot be too onerous, "lest the spoliator be permitted to profit from its destruction." *Quantlab Techs. Ltd.*, 2014 WL 651944, at *11 (cleaned up). Nonetheless, "showing that the lost information is relevant and prejudicial is an important check on spoliation allegations and sanctions motions." *Rimkus*, 688 F. Supp. 2d at 616. Speculative assertions that the lost evidence would have supported the injured party's claims or defenses are inadequate to justify the severest sanctions. *Id.*

6. Moreover, sanctions—particularly the most serious sanctions—are not mandatory even when the foregoing factors are satisfied. *Quantlab Techs. Ltd.*, 2014 WL 651944, at *11 (citing *Doe v. Am. Airlines*, 283 F. App'x 289, 291 (5th Cir. 2008)). To the contrary, "even if there is intentional destruction of

11

potentially relevant evidence, if there is no prejudice to the opposing party, that influences the sanctions consequence." *Id.* (quoting *Rimkus*, 688 F. Supp. 2d at 613).

7. When fashioning a remedy, "[t]he Court must weigh the degree of culpability and the extent of the prejudice and reach a sensible solution." *Id.* The remedy "should: (1) deter future parties from practicing spoliation; (2) punish the spoliating party for destroying relevant evidence; and (3) 'restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *Allstate Tex. Lloyd's v. McKinney*, 964 F. Supp. 2d 678, 682-83 (S.D. Tex. July 24, 2013) (quoting *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011)).

### B. Burke's deletion of emails warrants monetary sanctions but not the severest sanctions.

8. There is no dispute that Burke had a duty to preserve evidence when he deleted emails in his Comcast account after his laptop was imaged on October 5, 2021. BridgeTower has not shown that the severest sanctions are warranted. Instead, monetary sanctions are merited.

9. There is no evidence that some of the emails missing from Burke's production were deleted after October 5, 2021, as opposed to an earlier date before Burke had a duty to preserve evidence. *See Coastal Bridge Co.*, 883 F. App'x at 574 (first element of spoliation requires an "obligation to preserve [the

12

evidence] at the time of destruction").

10. BridgeTower presented a few emails dating from July 2 to July 28, 2021 that were not recovered from the forensic image. *See supra*, Findings of Fact ("FOF") ¶ 23 (citing PX14, PX17-19). On their face, these emails have at least some relevance to BridgeTower's claims.

11. Because Burke routinely cleaned out his email inbox, it is likely that those emails were not deleted in October. It is more likely that they were deleted even before Burke received the August 24, 2021 cease-and-desist letter that (according to the parties) triggered his duty to preserve evidence. The fact that these emails were not retrieved from the October 5, 2021 forensic image therefore does not show that Burke spoliated them. FOF ¶¶ 24-25.

12. Other deleted emails that were preserved by the October 5, 2022 forensic image of Burke's computer were not "destroyed," either in the spoliation sense or as prohibited by the TRO. *See Coastal Bridge Co.*, 883 F. App'x at 574 (second element of spoliation); Dkt. 8 ¶ 4. Even if they were altered or destroyed in the technical sense, BridgeTower's recovery of those emails from the forensic image undercuts its contention that their deletion prejudiced its ability to prove its claims. *See Quantlab Techs. Ltd.*, 2014 WL 651944, at *11 (lack of prejudice affects the appropriate sanction even if evidence was intentionally destroyed); *see* FOF ¶ 22.

13. Third, BridgeTower has not shown that any emails were lost

between the time Burke's laptop last connected to the Comcast web server on October 1 and the time it was imaged on October 5, 2021. FOF ¶ 21. None of BridgeTower's proffered exhibits suggests that any emails were deleted during that timeframe.

14. To be sure, Burke's post-forensic deletions foreclosed BridgeTower's expert from *definitively* ascertaining if the forensic image had captured all his Comcast emails before October 5, 2021. But BridgeTower has offered nothing beyond speculation that any emails were, in fact, lost during that limited timeframe between October 1 and October 5.

15. In addition, BridgeTower failed to show that any emails that allegedly were lost would have been relevant to its claims. *See* FOF ¶ 25. Speculative harm cannot justify imposing the severest sanctions. *See Rimkus*, 688 F. Supp. 2d at 616; *see also, e.g.*, *CAE Integrated, LLC v. Novak*, 2021 WL 3008296, at *8 (W.D. Tex. June 7, 2021) (rejecting assertions that party's actions may have affected metadata that may have been pertinent to the case); *Beck v. Access E Forms, LP*, 2018 WL 3752842, at *3 (E.D. Tex. Aug. 8, 2018) (denying spoliation sanctions even assuming emails were destroyed in bad faith because "there is little or no other evidence that those emails and chats contain evident that might exonerate [the defendant employer] from the overtime claims") (internal quotation marks omitted).

16. On the other hand, Burke was at least negligent or reckless in

14

deleting emails after the forensic image was taken. His justification does not pass muster. *See* FOF ¶¶ 15-18. Whereas Ricoh removed other information from his laptop through a transparent, monitored process, Burke unilaterally deleted his Comcast emails in secret, without consulting with his attorney, his vendor, or BridgeTower. He did not inform Ricoh of the deletions for months, even when Ricoh began gathering his emails for production in January 2022.

17. Burke's misconduct does not merit the severest sanctions—like the adverse inference instruction sought by BridgeTower. Yet some sanctions are warranted. His deletion of emails while under a duty to preserve them forced BridgeTower to incur expert fees and attorneys' fees investigating these issues, obtaining deleted emails through other sources, and deposing a forensic expert. FOF ¶ 26. Burke's culpability, the need for deterrence, and the need to compensate BridgeTower for the harm caused by Burke's misconduct favor requiring Burke to compensate BridgeTower for these expenses. *See Allstate Tex. Lloyd's*, 964 F. Supp. 2d at 682-83 (relevant factors for spoliation remedy).

18. The Court will award BridgeTower its expert and attorneys' fees incurred to recover Burke's deleted emails, obtain deleted emails through third-party discovery, and depose forensic experts. *See* Dkt. 46 at 15 (requesting these alternative sanctions). BridgeTower is directed to file a supplement detailing the amount and justifying the reasonableness of those fees and expenses.

15

### C. BridgeTower did not show that any deleted text messages were relevant.

19. The Court denies BridgeTower's request for sanctions based on the deletions of text messages by Burke and other WRG. Even if Defendants should have retained those messages, BridgeTower presented no evidence that those text messages would have been relevant to its claims.

20. Burke maintained that he did not conduct business communications via text. FOF ¶ 28. BridgeTower offered no contrary evidence. Nor did BridgeTower present evidence suggesting that other WRG employees (Nageotte, Springer, or Burns) used text messages to conduct relevant business communications.

21. Without evidence that the lost text messages were potentially relevant, FOF ¶ 30, sanctions are unwarranted. *See Quantlab Techs. Ltd.*, 2014 WL 651944, at *11; *Rimsku*, 688 F. Supp. 2d at 616.

22. Any findings of fact more properly characterized as conclusions of law are so deemed. Contrariwise, any conclusions of law that are more properly characterized as findings of fact are so deemed.

### III. Conclusion

For the foregoing reasons, it is **ORDERED** that Plaintiff BridgeTower Opco, LLC's Motion for "Contempt for Spoliation of Evidence and Motion for Sanctions" (Dkt. 46) is **GRANTED IN PART** and **DENIED IN PART**.

The motion is **GRANTED** in the following respect: Defendant Peter Burke must pay, as sanctions, reasonable expert fees and attorneys' fees incurred by BridgeTower when investigating the deletion of emails from Burke's Comcast account, obtaining copies of those emails from third parties, and deposing Defendants' forensic expert. Within 14 days of this order, BridgeTower must submit a supplement detailing and justifying the amount of reasonable expenses and fees incurred. Burke may file a response within 10 days after the supplement is filed, and BridgeTower will have 5 days thereafter to file any reply.

It is further **ORDERED** that BridgeTower's request for an adverse inference for the deletion of Burke's emails and its request for sanctions for Defendants' deletion of text messages are **DENIED.**

Any further requests for relief not expressly addressed herein are **DENIED**.

Signed on January 23, 2023 at Houston, Texas.

_____
Yvonne Y. Ho
United States Magistrate Judge